Phillip ANDERSON, Plaintiff,

v.

SARA LEE CORPORATION; Sara Lee Corporation Employee Benefits Administrative Committee; and Continental Casualty Co., Defendants.

No. CIV. 1:03CV284.

United States District Court, W.D. North Carolina. Asheville Division.

Dec. 17, 2004.

Heather Newton, Heather Newton, Attorney at Law, Asheville, NC, for Plaintiff.

Jill S. Cox, Constangy, Brooks & Smith, LLC, Winston–Salem, NC, Michael T. Graham, McDermott, Will & Emery, Chicago, IL, for Defendant.

## MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the parties' numerous motions which are addressed below.

## I. PROCEDURAL HISTORY

On November 25, 2003, the Plaintiff Phillip Anderson (Plaintiff or Anderson)

initiated this action alleging that the Defendants (collectively "Sara Lee") violated the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* (ERISA) by denying long term disability benefits under a long term disability benefits plan in effect through his employment. Complaint, filed November 25, 2003. On June 10, 2004, the Plaintiff moved this Court to settle the administrative record of the proceedings conducted before the Sara Lee claims administrator and its ERISA Appeals Committee. Plaintiff's Motion to Settle the Administrative Record, filed June 10, 2004. One month later, the Plaintiff moved for summary judgment. Plaintiff's Motion for Summary Judgment, filed July 9, 2004.

When the Defendants responded to the motion to settle the record, they included the affidavit of Daniel Ryan in which he provided an explanation of the review structure of disability claims and identified the administrative record. Exhibit A, Affidavit of Daniel W. Rayan, *attached to* Defendants' Response to Plaintiff's Motion to Settle the Administrative Record, filed June 28, 2004. That affidavit is identical to one attached as an exhibit to the Defendants' cross-motion for summary judgment, filed July 16, 2004. *See* Exhibit A, *attached to* Defendants' Memorandum of Law in Support of Summary Judgment, filed July 16, 2004. The Plaintiff moved to strike the affidavit in connection with the motion to settle the administrative record on the ground that a party may not supplement the record with an affidavit. Plaintiff's Reply to Defendants' Response to Motion to Settle the Administrative Record, and Motion to Strike Affidavit of Daniel Ryan, filed June 31, 2004.

On August 12, 2004, the Plaintiff moved to strike the affidavit of Lisa Hogan Anderson because it was not included in the administrative record. Plaintiff's Mo-

tion to Strike Affidavit of Lisa Hogan Anderson, filed August 12, 2004.

The numerous motions are now ripe for disposition.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir.2003)(quoting Fed.R.Civ.P. 56(e) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson, supra* ). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat*, 346 F.3d at 522 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. *Id.*

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered." *Id.* (quoting Fed.R.Civ.P. 56(e) and *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987))(other internal citations omitted). Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. THE LANGUAGE OF THE PLAN AT ISSUE

The Defendants have admitted through their Answer the following facts which are, therefore, not in dispute:

1. Sara Lee Corporation is the plan sponsor of the long term disability plan (Plan) which is at issue. Defendants' Joint Answer, Affirmative Defense, and the EBAC's Counterclaim for Overpayment of Benefits, filed January 9, 2004, ¶ 2.[1]

2. Sara Lee Corporation Employee Benefits Administrative Committee (EBAC) is named as the Plan Ad-

ministrator in the language of the Plan contract. *Id.*, ¶ 3.

3. Continental Casualty Company (CNA) has been retained by Sara Lee and EBAC to process claims under the Plan and is authorized to make initial determinations of eligibility for benefits under the Plan. *Id.*, ¶ 4. In fact, CNA made the initial determination that the Plaintiff was not eligible for disability benefits under the Plan. *Id.*

The Plan itself defines "administrator" as meaning EBAC "and/or such individuals as [the Company] may designate from time to time in writing to carry out any or all of its duties and responsibilities for the administration of the Plan." Exhibit H, Sara Lee Corporation Long Term Disability Plan, effective July 1, 1998, *attached to* Defendant's Motion for Summary Judgment ["Defendants' Motion"], at 00092–93. "To facilitate the administration of the Plan, the Administrator may employ such persons ... or organizations as it, from time to time, shall designate to carry out specific duties and responsibilities in administering the Plan" including the responsibility to investigate, approve and deny claims. *Id.*, at 00108–09, 00113. The Plan also contains the following provision related to the discretion of the Administrator:

The Company, the Administrator and any entity or organization to which the Company delegates authority pursuant to the terms of the Plan, shall have the discretionary authority to construe and interpret the Plan and make factual determinations thereunder, including the authority to determine eligibility of employees and the amount of benefits payable under the Plan, and to decide

---

1. The Defendants subsequently dismissed the counterclaim. *See* Stipulation of Dismissal of Counterclaim, filed July 16, 2004.

claims under the terms of the Plan. Subject to applicable law, any interpretation of the provisions of the plan and any decisions on any matter within the discretion of the Company, Administrator or other applicable entity made in good faith shall be binding on all persons. A misstatement or other mistake of fact shall be corrected when it becomes known, and the Company, Administrator or other applicable entity shall make such adjustment on account thereof as it considers equitable and practicable.

*Id.,* at Section 5.14, 00111–12.

In January 2002, Section 5.7 of the Plan was amended to provide that "[b]enefits will be paid only if the Administrator, or its delegate, determines in its discretion that the applicant is entitled to them." *Id.,* at 00129. To the extent that costs and expenses of the Plan are not covered by the Trust Fund, the same are to be paid by Sara Lee. *Id.*

## IV. ERISA STANDARD OF REVIEW

 The sole claim alleged in the complaint is the failure to pay benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) which provides that a "civil action may be brought by a participant or beneficiary ... to recover benefits due to him under the terms of his plan[.]"

It is well-established that a court reviewing the denial of disability benefits under ERISA initially must decide whether a benefit plan's language grants the administrator or fiduciary discretion to determine the claimant's eligibility for benefits, and if so, whether the administrator acted within the scope of that discretion. Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion. Thus, a trustee's discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion. Under the abuse of discretion standard, the plan administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence. It is undisputed ·that [Defendants] possessed discretionary authority to determine [Plaintiff's] entitlement to benefits. Accordingly, [the undersigned] review[s] the denial of benefits for an abuse of discretion.

Where, however, an administrator or fiduciary with discretion is operating under a conflict of interest such that its decision to award or deny benefits impacts its own financial interests, ... that conflict must be weighed as a factor in determining whether there is an abuse of discretion. In such a situation, [the court must] modify the abuse of discretion standard[.]

[W]hen a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, [the court] will not act as deferentially as would otherwise be appropriate. Rather, [the court] will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

[I]n no case does the court deviate from the abuse of discretion standard. Instead, the court modifies that abuse of discretion standard according to a slid-

ing scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it. The [undersigned] recognize[s] that the modified abuse of discretion standard [is] appropriate because [Defendants], directly and indirectly, both insure[d] and administer[ed] the Plan.

*Smith v. Continental Cas. Co.*, 369 F.3d 412, 417–18 (4th Cir.2004)(quoting *Doe v. Group Hosp. & Med. Servs.*, 3 F.3d 80, 87 (4th Cir.1993))(other internal quotations and citations omitted); *accord, Stup v. Unum Life Ins. Co. of America*, 390 F.3d 301, 306–07 (4th Cir.2004); *King v. Square D Co.*, 2004 WL 537730, at *15 (W.D.N.C. 2004); *Barnes v. BellSouth Corp.*, 2003 WL 22399567, at *7 (W.D.N.C.2003)("[A] fiduciary who is retained by an employer to administer a disability benefits plan, even where payments come from the employer's funds, is faced with a conflict of interest that necessitates a modified abuse of discretion standard for reviewing its decisions.").

## V. THE MOTION TO SETTLE THE RECORD

The Plaintiff argues that the administrative record should be amended to include documents bearing Nos. 471–481 and 485–564. Exhibit 1, *attached to* Plaintiff's Motion to Settle Administrative Record, filed June 10, 2004. These documents are copies of the actual disability claim file maintained by CNA during its investigation of the Plaintiff's claim, including copies of the Plaintiff's application for social security disability benefits. Because the disability determination of the Defendants is independent of the Social Security Administration's ruling, the Court will not supplement the record with social security applications or decisions. *Smith*, 369 F.3d at 415 n. 2. Plaintiff also seeks to supplement the record with copies of letters between counsel about settling the record. Exhibit 2, *attached to* Plaintiff's Motion to Settle Record. The Plaintiff does acknowledge, however, that the documents in question were never actually reviewed by the EBAC or the ERISA Appeal Committee. In addition, the Plaintiff claims that the actual denial notice sent to him on December 9, 2002, should be made a part of the administrative record. However, the Court's review of the administrative record discloses that this decision is, in fact, contained within the record. *See* Exhibit J, *attached to* Defendants' Motion, at 00158–59.

When a district court reviews a plan administrator's decision under the abuse of discretion standard, an assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time. If the court believes the administrator lacked adequate evidence on which to base a decision, the proper course [is] to remand to the trustee for a new determination, not to bring additional evidence before the district court.... [A] plan administrator is under no duty to secure specific forms of evidence.

*Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir.1999)(internal quotations and citations omitted). "In contrast, when a district court conducts a *de novo* review of ERISA benefits claims, *i.e.,* where the benefit plan does not give the administrator or fiduciary discretionary authority to determine eligibility for benefits, it may in its discretion consider evidence that was not before the plan administrator." *Id.,* at n. 6. Such is not the case here and the motion will be denied. *Booth v. Wal–Mart*

*Stores, Inc., Assoc. Health & Welfare Plan*, 201 F.3d 335, 339 n. 1 (4th Cir.2000).

It must be noted, however, that having reviewed the documents which the Plaintiff seeks to add to the record, the Court is of the opinion that the addition thereof to the record would not result in a different ruling herein. As for the affidavit of Daniel Ryan, it was submitted in connection with the motion for summary judgment in order to authenticate the administrative record as required by Federal Rule of Civil Procedure 56. *Nester v. Allegiance Healthcare Corp.*, 162 F.Supp.2d 901 (S.D.Oh. 2001), *aff'd*, 315 F.3d 610 (6th Cir.2003)(administrative record in ERISA authenticated by affidavit); *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir.1993). It has not been considered, however, as part of the record before the administrator at the time of the decision.

## VI. THE MOTIONS TO STRIKE

■ The Plaintiff moved to strike the affidavit of Daniel Ryan which was submitted in connection with the Defendants' response to the motion to settle the record. That affidavit identified the contents of the record and supports the Defendants' arguments concerning the appropriate standard of review in an ERISA case. In addition, as noted above, it was submitted in order to authenticate the administrative record as required by the Federal Rules of Civil Procedure. Likewise, the Defendants filed an affidavit from Lisa Anderson in support of the motion for summary judgment to clarify their argument as to the relevant standard of review. The Court finds the Plaintiff's motions to strike are without merit and both motions are, therefore, denied.

## VII. FINDINGS OF FACT

On December 7, 1999, the Plaintiff was working as a truck driver in food service delivery. Exhibit D, Functional Capacity Evaluation, *attached to* Defendants' Motion, at 00037. On that date, he lifted a box weighing about 60 pounds when the box ripped open, jerking both of his arms and resulting in torn rotator cuffs in both shoulders. *Id.*

On December 15, 1999, the Plaintiff had an MRI[2] of his left shoulder which revealed that a tendon in his rotator cuff had been re-torn. Exhibit C, *attached to* Defendants' Motion, at 00034. In addition, he had a "massive rotator cuff tear" in his right shoulder. *Id.*, at 00035. On December 21, 1999, the Plaintiff was seen by his orthopedic surgeon, Dr. Gordon Groh, who noted that his options were to do nothing, "in which case his shoulder symptoms may continue to get worse over time and tear may progress," or to opt for surgery. *Id.*, at 00036. By January 4, 2000, the Plaintiff had determined to go forward with surgery on the left shoulder first and Dr. Groh noted that it was "doubtful he will be able to return to heavy repetitive overhead use with his arms." *Id.* The Plaintiff had surgery on his left shoulder in February 2000 and on his right shoulder in August 2000. Exhibit D, 00038.

After his February 2000 surgery, Dr. Groh referred the Plaintiff for physical therapy. Exhibit K, *attached to* Defendants' Motion, at 00378–79. In the physical therapist's report of April 5, 2000, she noted the Plaintiff was making good progress, was given new exercises, and advised to continue them independently with a home program. *Id.* The record shows that the Plaintiff began physical therapy again in June 2000. *Id.*, at 00210–22. On July 21, 2000, he reported that he had just

---

2. Magnetic resonance imaging. *Dorland's Illustrated Medical Dictionary* (28th ed.1994).

come back from vacation and spent a lot of time swimming. *Id.*, at 00222. The physical therapist noted that he had good range of motion which was within normal limits in all directions. *Id.* "His subjective reports of pain appear to be the limiting factor in his objective progress." *Id.* Although this therapy continued through January 2001, the Plaintiff continued to report pain. *Id.*, at Bates Nos. 00222–33. The therapist, however, continued to note either improving or good range of motion and improving strength. *Id.*

On April 28, 2000, Dr. Groh completed a physician's statement for CNA in which he opined that the Plaintiff's first injury occurred in September 1998 and he noted surgery of the left shoulder rotator cuff had been performed. Exhibit C, *supra*, at 00030–31. Dr. Groh noted that approximately 80 percent of the cuff had been repaired and the Plaintiff was doing well. *Id.* On November 21, 2000, Dr. Groh noted the Plaintiff's primary diagnosis was "bilateral chronic massive rotator cuff tears" accompanied by "severe pain, limited abilities in lifting [and] overhead use" following repeated repairs on both shoulders. *Id.*, at 00028–29. Dr. Groh had last seen the Plaintiff on October 11, 2000, and had prescribed a strengthening program along with anti-inflammatory medications. *Id.* At that time, the Plaintiff was incapable of minimum, sedentary activity. *Id.* Nonetheless, on November 26, 2000, Dr. Groh opined that the Plaintiff could perform sedentary employment on a full time basis. *Id.*, at 00027.

In February 2001, the Plaintiff was being treated by Dr. Lesco Rogers for his pain management at which time it was noted that he was on opiate therapy. *Id.*, at 00015–16. Although at the time, Dr. Rogers found the Plaintiff was incapable of even sedentary work, he did consider the Plaintiff suitable for vocational rehabilitation beginning in May 2001. *Id.*

During the Plaintiff's annual physical examination in July 2001, he reported to Dr. Hal S. Hemme, his primary care physician, that he had not worked for the past six months due to pain in his shoulders and back. Exhibit K, *supra*, at 00326. Prior to that time, the Plaintiff had been delivering groceries to restaurants. *Id.*

On August 7, 2001, Dr. James Hall, clinical psychologist, opined that the Plaintiff was severely depressed secondary to his pain condition and noted that stress would occur in connection with "anything that requires initiative, concentration, [or] problem solving relating to groups." Exhibit C, *supra*, at 00018. Dr. Hall saw the Plaintiff again on August 14, 2001, at which time "[t]here [was] very little pain behavior noted as the tension appears to be more associated with the sources of stress that he describes." Exhibit K, *supra*, at 00366. Dr. Hall decided that a shift into group therapy would be more beneficial for the Plaintiff. *Id.* During his first group therapy session about one week later, the Plaintiff described the stress in his life as being the loss of income and his ability to be a provider. *Id.*, at 00365. Dr. Hall noted that the Plaintiff was "stuck on negative events such that he presents himself as the victim." *Id.* On August 28, 2001, Dr. Hall noted that the Plaintiff was doing well in group therapy and using it to vent his frustration. *Id.*, at 00364. Dr. Hall noted after the September 11, 2001, session that the Plaintiff persisted in his role as a victim. *Id.*, at 00363. "The pt is rather entrenched in victim thinking but is able to hear that he has some choice in that attitude." *Id.*, at 00362. By October 2001, Dr. Hall found that the Plaintiff was beginning to re-frame his negative outlook. *Id.*, at 00360. At the end of November 2001, the pain practice at which the Plain-

tiff was receiving group therapy was going to close due to the relocation of the physicians. *Id.,* at 00356. Dr. Hall noted that the Plaintiff reverted to his role as a victim, claiming that anything good was usually taken from him. *Id.* At the December meeting, the Plaintiff "reported receiving word that he is inelligible (sic) for disability and worker's comp, but that he is pre-certified for the spinal cord stimulator implant by Dr. Rogers." *Id.,* at 00355. "He does get depressed at times but seems to be able to rebound better than before." *Id.* At the January 2002 session, the "patient was more open than ever in disclosing family circumstances. He also seemed a bit less 'victim' minded." *Id.,* at 00352. Later that month, Dr. Hall noted that the Plaintiff was "still harboring old victim oriented attitudes but they have certainly not been as prominent as when the group first formed. He remains open to exploring options for managing his pain at a lower level." *Id.,* at 00349. On January 29, 2002, the Plaintiff

> showed the group three letters he received setting up two more evaluations associated with his disability benefits application. He was very frustrated with the whole process of receiving medical care for his condition, remaining unable to work, and the indignities encountered in his effort to obtain disability status. . . . He was especially appreciative of the group and the opportunity vent his feelings.

*Id.,* at 00347. By February 2002, Dr. Hall noted that the Plaintiff had become less focused on the emptiness of life. *Id.,* at 00345. At the March 2002 session, Dr. Hall wrote that the Plaintiff was "experiencing renewed levels of stress stemming from family issues. He is increasingly able to use the group to vent his emotions." *Id.,* at 00342. At the May 2002 session, the Plaintiff reported that he continued "to experience high levels of pain

from multiple sources, however, his primary source, bilateral shoulders, has improved slightly. He reports the usual level of this pain going from 8 or 9 down to 7." *Id.,* at 00338.

On February 1, 2002, the Plaintiff was seen for a psychological consultation with Karen Marcus, Psy.D., who opined that the Plaintiff "has the cognitive capacity to function appropriately in a job situation." *Id.,* at 00375. He had the communication and social skills to interact appropriately in a job setting. *Id.* "Although he does appear to be significantly depressed, and this may impact his concentration and short term memory, it does not appear to affect his judgment." *Id.,* at 00375–76.

On February 6, 2002, the Plaintiff was evaluated by Dr. Dale Mabe to whom the Plaintiff reported that his physical therapist had told him "there was nothing more than can be done[.]" *Id.,* at 00368. The Plaintiff reported as well that he could not lift anything heavier than a gallon using both hands and had difficulty using his hands, such as in the act of pouring. *Id.* In addition to his shoulder pain, which he described as a "constant 9 out of 10," the Plaintiff reported low back pain which "he qualifies [as] 8 to 10 out of 10" although he admitted there had been no diagnostic evaluation thereof. *Id.,* at 00368–69. He also reported knee pain and depression. *Id.* The Plaintiff advised that he could sit for an hour at a time, stand for 15 minutes, and walk about 30 minutes at a time. *Id.,* at 00371. While he did not drive due to the pain medication which he took, he could ride in the car for an hour at a time. *Id.* The Plaintiff reported some suicidal ideation but denied any plans to act thereon. *Id.* He also reported visual hallucinations in the form of angels although he could not explain any detail. *Id.*

On February 27, 2002, Dr. Hemme advised as follows:

Mr. Anderson has been a patient in our office since January 1996.[I]n October of 1998, the patient underwent bilateral rotator cuff repair which produced very poor results and in fact, left him with limited range of motion and limited use of both arms. He continues to have unrelenting shoulder and peri-scapular pain with virtually any movement. He was recently seen in our office on 02/07/02 at which time he complained of ongoing pain which is unrelenting, virtually constant during the day and which limits his range of motion in his arms bilaterally with abduction limited to about 45 [degrees]. Flexion/extension is limited to roughly half normal range of motion. He does have fairly good internal and external rotation. He is currently maintained on a pain regimen consisting of Oxy–Contin 20 mgs three time per day and states that this really is not sufficient to contain his pain and he interested in looking at other modalities.... At present, I would consider Mr. Anderson total (sic) disabled by your criteria. Quite frankly, I do not expect him to return to any type of full time employment as he has such limited range of motion of his shoulders which prevents lifting, pushing, pulling or repetitive movement.

Exhibit C, *supra*, at 00024. On March 3, 2002, Dr. Hall noted the Plaintiff had been referred for a psychological consultation due to his depression stemming from his severe pain. *Id.*, at 00025.

On August 21, 2002, Dr. Duncan Scott, who treated the Plaintiff for pain management, advised that he was "using several high-dose opioids to control his pain. We have tried interventional procedures, with no benefit...: Due to the significant trauma to his shoulders, and his requirement for high-dose narcotics to give even mediocre pain relief, I consider him disabled from any type of meaningful employment." *Id.*, at 00010.

On June 13, 2002, the Plaintiff underwent a functional capacity evaluation at HealthSouth Sports Medicine & Rehabilitation Center by Janet Brickhouse, a physical therapist. Exhibit D, *supra*, at 00037–43. She noted a limited range of motion in both shoulders, with the right being more limited than the left, and limited shoulder strength. *Id.*, at 00037. Functional testing indicated the Plaintiff could lift in the light category of work with the ability to sit and stand on a constant basis, walk, bend, climb and stoop on a frequent basis and occasionally reach overhead. *Id.* She noted inconsistencies between the Plaintiff's reported abilities and objective evidence, such as, calluses and stains on his right hand which were consistent with the ability to perform activity. *Id.* During the musculoskeletal evaluation, the Plaintiff experienced tremors in the right forearm and hand; however, this was not present during functions such as writing and drinking or handling materials. *Id.* The strength in the Plaintiff's right hand tested inconsistently, at times being in the good to good plus ranges. *Id.* During the evaluation, the Plaintiff reported to the therapist that "he currently works from his home assisting his wife in her home business selling garden items (plants and statuary). [Plaintiff] reports that he handles customers and 'minds the store.'" *Id.*, at 00038. He explained the stains as coming "from planting stuff." *Id.*, at 00039. The Plaintiff "demonstrated exertional trembling of the right upper extremity during formal testing of single leg stance. This was not observed during materials handling, when walking across room or in parking lot, or during the treadmill test." *Id.*, at 00038.

On May 15, 2002, the Plaintiff was seen for another psychological evaluation by Randel Jones, Clinical Psychologist. Exhibit E, *attached to* Defendants' Motion, at 00045–51. The Plaintiff reported his interests and hobbies as including walking; however, he was no longer able to work in the yard, do woodworking or gardening. *Id.*, at 00047. "He spends his day helping with light household chores such as washing the dishes and doing the laundry. He also helps with meal preparations." *Id.* Jones opined that the Plaintiff's physical symptoms could be exacerbated by his emotional factors. *Id.*, at 00049.

> The current evaluation indicates a rather severe level of depression that . . . alone could interfere with normal day-to-day activities and some forms of full-time employment. [The Plaintiff's] ability to cope with his difficulties is further complicated by his limited education. [He] is likely to have the greatest degree of difficulty performing tasks that require sustained attention and concentration, manipulation of complex problems, and management of high levels of stress or conflict.

*Id.*, at 00050. Jones noted that from a psychological perspective, the Plaintiff was capable of performing low-level cognitive, routine and repetitive tasks for monetary gain on a full-time basis. *Id.*, at 00045.

On June 21, 2002, a vocational case manager with CNA determined, after reviewing the Plaintiff's medical records and considering his work history, educational background and current functionality, that he retained the capacity to work as a telephone sales representative, telephone customer service representative or account service representative. Exhibits F and L, *attached to* Defendants' Motion, at 00053, 00457.

On February 25, 2003, Dr. Robert Eaton evaluated the Plaintiff for purposes of worker's compensation and provided a second opinion concerning his bilateral shoulder pain. Exhibit K, *supra,* at 00292, 00293–95. Dr. Eaton noted, in his review of the Plaintiff's medical records, that Dr. Groh had previously opined in February 2001 that the Plaintiff had a 15 percent permanent disability to his left shoulder and a 16 percent permanent disability to his right shoulder. *Id.*

> The patient describes not only problems with constant pain in both of his shoulders with severe limited use of shoulders, but neuritis symptoms of pain extending from his neck through his shoulder girdle, into the interscapular region and down both of his arms on a recurrent basis, aggravated by almost any type of activity.

> . . . . .

> This patient presents with recent MRI studies. The cervical spine MRI is dramatic in the level of disk herniation at the C6–7 level. . . . This patient's shoulder MRIs demonstrate persisting bilateral rotator cuff tear.

*Id.*, at 00290–91. Dr. Eaton found that the Plaintiff suffered from "[r]ecalcitrant persisting bilateral rotator cuff tears with retraction. These are chronic and severely degenerative tears. In addition, he has a significant degenerative disk condition at the C6–7 level." *Id.*, at 00287. Dr. Eaton found that the Plaintiff was functionally, totally disabled. *Id.*

The Plaintiff's last day of work at Sara Lee was December 7, 1999, the day on which he was injured. Exhibit L, *supra,* at 00454. After satisfying the 180–day elimination period under the Plan, the Plaintiff began receiving disability benefits on June 5, 2000, and those benefits continued through July 22, 2002. *Id.* One month prior to the end of that scheduled continuation period, the Plaintiff was notified that

benefits would not continue past that date because it had been determined that he was no longer disabled pursuant to Subsection 2.6 of the Plan. *Id.* The Plaintiff appealed that decision and received a decision from the Appeal Committee on December 9, 2002, in which it was found that he "no longer met the definition of 'total disability' as that term is defined in the Plan for the period following the elimination period and the first 24 months thereafter." Exhibit J, *attached to* Defendants' Motion, at 00158–59.

The Plaintiff requested the Appeal Committee to reconsider its decision, a request which was granted. Exhibit L, *supra,* at 00452. Among the medical records reviewed and considered by the Committee were the records of Dr. Eaton who provided a second opinion of the Plaintiff's condition in February 2003. *Id.,* at 00453, 00455. However, upon reconsideration, the Committee determined on May 28, 2003, that the Plaintiff was not disabled under the Plan because he was "able to engage in an occupation or employment for which [he was] or may become reasonably qualified to do." *Id.,* at 00460.

On August 6, 2003, the Plaintiff requested the Committee to reconsider his appeal a second time because after the December 9, 2002, decision, the Plaintiff was awarded Social Security disability benefits. Exhibit M, *attached to* Defendants' Motion, at 00469. By letter dated September 2, 2003, the Plaintiff was advised that the Committee declined to reopen and reconsider his appeal. *Id.*

## VIII. CONCLUSIONS OF LAW

Pursuant to the language of the Plan,[3] disability benefits are not payable until after the expiration of 180 days beginning on the day after the employee's last day of active employment or work prior to total disability, *i.e.,* the "elimination period." Exhibit H, *attached to* Defendants' Motion, at 00094, 00098, Sections 1.2(j), 2.4. "Total disability" is defined as the inability "to perform each and all of the material duties pertaining to [an employee's] occupation" if the employee "is not engaged in any occupation or employment for wage or profit for which he or she is reasonably qualified by education, training or experience" during the elimination period and during the first 24 months thereafter. *Id.,* Section 2.6, at 00099. However, after this initial period of disability, *i.e.,* after the elimination period plus 24 months, the term "total disability" has a different definition:

the continuous inability of the Covered Employee, due to sickness or bodily injury, to engage in each and every occupation or employment for wage or profit that he or she is reasonably qualified to do or may become reasonably qualified to do by education, training or experience without regard to (i) whether such occupation or employment exists in the geographic area in which the Covered Employee resides, (ii) whether a specific vacancy in such occupation or employment exists, (iii) whether a Covered Employee is likely to be hired if he or she applied for such occupation or employment, and (iv) whether the earnings of such occupation or employment are comparable to those earned by a Covered Employee before his or her disability.

*Id.*

▇▇▇ In addition to considering the language of the Plan, the Court will consider "the adequacy of the materials considered to make the decision and the degree to which they support it[;]" "whether the de-

---

3. "As with any interpretation of a contractual trust document, we begin by examining the language of the Plan[.]" *Booth,* 201 F.3d at 343.

cisionmaking process was reasoned and principled[;]" and "the fiduciary's motives and any conflict of interest it may have." *Booth*, 201 F.3d at 342–43. As a result, the Court will first review the decisions of the Appeal Committee.

On December 9, 2002, the Committee reviewed the Plaintiff's appeal of the denial of long term disability benefits and noted

[Plaintiff's] last day of work for PYA Monarch was December 7, 1999 due to shoulder injuries. He underwent surgery for his left shoulder in February 2000 and for his right shoulder in August 2000. A May 15, 2002 psychological evaluation indicates that [Plaintiff] is able to perform low-level cognitive routine and repetitive tasks on a full-time basis. The results of a June 13, 2002 functional capacity evaluation reveal that [Plaintiff] is able to engage in light duty work. Similarly, the results of a June 21, 2002 vocational assessment reveal that [Plaintiff] is able to engage in light duty work. [Plaintiff's] physician, Dr. Duncan R.C. Scott II, indicated in a letter dated August 21, 2002 that [Plaintiff] is disabled from "meaningful" employment. However, other evidence suggests that [Plaintiff] has on occasion engaged in light duty work while assisting his wife with her business.

. . . . .

Based on the facts presented to this Appeal Committee, the Appeal Committee has determined that [Plaintiff] is not totally disabled as that term applies to the time period following the elimination period and the first 24 months thereafter because he is able to engage in an occupation or employment for which he is or may become reasonably qualified to do.

Exhibit J, at 00159. The Plaintiff requested reconsideration of this appeal and on

May 28, 2003, he was advised of the Committee's decision after that reconsideration was given. Exhibit L, at 00452–61. The letter explaining the Committee's decision shows that all of the Plaintiff's medical records from treating physicians, psychologists and physical therapists were considered, as well as the opinion of Dr. Eaton, the records from evaluating physicians and psychologists and the functional capacities evaluation of HealthSouth Sports Medicine & Rehabilitation Center. *Id.*, at 00453. The vocational assessment of the Plaintiff's vocational case manager was also reviewed. *Id.* The records of these physicians, psychologists and physical therapists were summarized and in particular, the following items were noted:

In a statement dated November 26, 2000, Dr. Groh indicated that you were able to engage in sedentary work on a full-time basis[.]

. . . . .

Over the period of your treatment from [the physical therapist], your range of motion in both shoulders and your flexibility improved since the surgery, but you continued to suffer pain as a result of the therapy.

. . . . .

In a physicians' statement dated July 2001, the Appeals Committee found that Dr. Rogers [the pain management physician] provided contradictory information with respect to your ability to perform any job. While he concluded that you will never recover sufficiently to perform the duties of your job or any other job, he also indicated that you had a limited ability to work with your hands above your shoulders. In addition, he suggested that you would be an ideal candidate for cervical spinal cord stimulation that

could improve your overall qualify of life by decreasing the pain you suffer.

. . . . .

In an undated physicians' statement, Dr. Scott indicated that you will never recover sufficiently to perform the duties of your job or any other job because you are unable to control your pain at present. However, in a letter dated August 21, 2002, Dr. Scott concludes that you are disabled only from any type of *meaningful* employment due to the trauma to your shoulders and the high-dose narcotics you take for pain relief.

. . . . .

In a letter dated February 27, 2002, Dr. Hemme stated that he did not *expect* you to return to any type of full-time employment due to your shoulder injuries.

. . . . .

Dr. Hall [who saw the Plaintiff in group therapy] did not opine as to whether you are disabled as defined under the Plan. Also, Dr. Hall referenced that your mental health was affected not only by your physical health but also by stress associated with family and financial issues.

. . . . .

Dr. Marcus . . . concluded that you have the cognitive capacity to function appropriately in a job situation and that you have the *communication and social skills* to be able to interact appropriately with others.

. . . . .

[Dr. Jones] indicates that you suffer from a severe level of depression that could interfere with *some* forms of full-time employment. On June 11, 2002, Dr. Jones submitted an addendum to this prior report, concluding that you are employable, finding that, from a psychological perspective, you are capable of performing low-level cognitive, routine and repetitive tasks for monetary gain on a full-time basis.

. . . . .

[Physical therapist] Brickhouse . . . concluded [in June 2002] that you were . . . lifting in the [light] category of work (according to U.S. Department of Labor Standards). She also concluded from your physical testing that you demonstrated a tolerance of sitting and standing on a constant basis, walking, stair climbing, bending . . . and forward reaching on a frequent basis and overhead reaching . . . pushing and pulling on an occasional basis. She further noted that you reported an intolerance of activities with concurrent presence of calluses and stains on your right palm. . . . [Y]ou indicated that the calluses and stains on your hand were from "planting stuff" around your house. . . . [Y]ou stated that you currently work from home assisting your wife in her home business, selling garden items, handling customers and "minding" the store.

. . . . .

Ultimately, while you presented the Appeal Committee with conflicting opinions and evidence with respect to whether you meet the Plan's definition of disabled under the "any occupation" definition, the Appeal Committee has determined that you are not totally disabled . . . because you are able to engage in an occupation or employment for which you are or may become reasonably qualified to do.

. . . . .

[N]either ERISA nor the Plan require a plan administrator to submit all aspects of a disability claim to a single indepen-

dent medical examiner before a decision is made[.]

. . . . .

[I]t is irrelevant whether CNA evaluated your conditions in isolation. Here, the Appeal Committee is the fiduciary charged with making the final decision related to your benefits claim. . . . [T]he Appeal Committee has considered the medical and vocational opinions of all medical and other treatment providers together in making the determination[.] . . . The Appeal Committee utilized independent medical examiners to gather their opinion related to their particular specialty.

. . . . .

[T]he Appeal Committee finds that you are not "virtually illiterate" as your counsel has described. Rather, you are capable of performing some job for monetary benefit.

*Id.*, at 00455–60.

The Court notes that the administrative record bears out the inconsistencies described by the Appeal Committee. *Conrad v. Continental Cas. Co.*, 232 F.Supp.2d 600, 603 (E.D.N.C.2002) ("In making this determination, the court will assess the fiduciary's interpretation of the plan, the totality of claimant's illnesses, the objective medical proof provided by the claimant, the judgments of the treating physicians versus the fiduciary's consulting physician, and the timing of the review with regard to the progression of the plaintiff's physical condition."). Plaintiff's first surgery was in January 2000 followed by a lengthy period of physical therapy. Throughout that therapy, the physical therapist noted that the Plaintiff's range of motion was either improving or good. In July 2000, the therapist noted the Plaintiff's report that he had recently been on vacation where he had done a good

deal of swimming and further noted that the Plaintiff's subjective reports of pain were not consistent with objective medical findings. *Jordan v. Northrop Grumman Corp., Welfare Benefit Plan*, 63 F.Supp.2d 1145 (C.D.Cal.1999), *aff'd*, 370 F.3d 869 (9th Cir.2004)(the ability to perform household tasks refuted claim of disability). During the last physical therapy session before the Plan stopped paying, the therapist noted improved range of motion despite the Plaintiff's continued reports of pain.

In November 2000, three months after the right shoulder tear was repaired, Dr. Groh opined that the Plaintiff could perform sedentary work. Indeed, throughout 2000 the Plaintiff reported his pain was decreasing and he relied very little on pain medication. Exhibit K, *supra*, at 00194–200 ("He needs no additional pain medication."). In December 2000, Dr. Groh found the Plaintiff had reached maximum medical improvement in his shoulders and did not refute his earlier conclusion that the Plaintiff could perform sedentary work. Instead, in view of the Plaintiff's increased allegations of pain, he referred the Plaintiff for pain management. In February 2001, the physician treating the Plaintiff for his pain management noted that while he could not work at that time, by May 2001 he would be ready for vocational rehabilitation. *Reagan v. First UNUM Life Ins. Co.*, 39 F.Supp.2d 1121, 1123 (C.D.Ill.1999) (physicians noted claimant's preparedness for vocational rehabilitation).

During his annual physical with his primary care provider in July 2001, the Plaintiff reported while he had not been able to work for the past six months, prior to that time he had been delivering groceries to restaurants. This report would have the Plaintiff working in December 2000.

In August 2001, the psychologist treating the Plaintiff in group therapy wrote that he could not handle work related stress but noted that he did not exhibit pain behavior as much as stress related to his lack of income.

In February 2002, the psychological consultation reported the Plaintiff was depressed but could interact sufficiently to hold a job. That same month and contrary to the notes of the physical therapist, the Plaintiff reported to Dr. Mabe that the physical therapist had discharged him because there was nothing more that could be done to help him. His pain, he reported, was at 9 out of 10, complicated by low back and knee pain which he acknowledged had not been diagnosed. During this interview, the Plaintiff also spoke of having visual hallucinations of angels but provided no details.

Likewise, in February 2002, the Plaintiff reported to Dr. Hemme that his pain continued and his range of motion was diagnosed at roughly half the normal range. In May 2002, the Plaintiff reported to another evaluating physician that his hobbies included walking and, although he used to garden, he could no longer do so. That evaluator noted that his physical symptoms were aggravated by his emotional condition.

Nonetheless, in June 2002, the Plaintiff reported to a different evaluator that he worked in his wife's business, dealing with customers and minding the store. Calluses on his hand were reported by him to be the result of gardening, the same activity which he had reported one month earlier as being unable to perform. *Id.*, at 1127 (claimant's ability to work during period claiming total disability a factor to be considered in weighing the discretion of the Plan); *Jordan, supra.*

 This evidence accords with the decision of the Appeal Committee which noted the inconsistencies among the medical reports as well as the Plaintiff's own inconsistent comments about his pain and abilities. *Elliott*, 190 F.3d at 606 ("The Fourth Circuit has held it is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented."). It is true that both the Plaintiff's primary care provider and Dr. Eaton opined that he was disabled. And, the most recent report, which was considered by the Committee, was Dr. Eaton's February 2003 report of disability. Nonetheless, the undersigned does not find that the Committee's decision was not "the result of a deliberate, principled reasoning process" or that it is not "supported by substantial evidence." *Stup, supra.* The Plaintiff's admission that in June 2002 he was working in his wife's business constituted substantial evidence of both the mental and physical abilities to perform sedentary work. *Id.*, at *6 ("Just as clearly, this evidence would not require [Defendants] to award benefits if it had 'substantial evidence' that [Plaintiff] could perform sedentary work."); *Reagan, supra* (employee's admission that he worked defeated claim). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Davidson v. Kemper Nat'l Servs., Inc.*, 231 F.Supp.2d 446, 451 (W.D.Va.2002) (citations omitted). The Court finds this admission, coupled with the inconsistent reports made by the Plaintiff to his various providers constitutes substantial evidence to support the decision of the Plan, even considering the conflict of interest under which it labored.[4]

---

4. The Plaintiff argued that the evaluation performed by HealthSouth should be discounted

because that corporation provides reports biased towards employers. "Although partiali-

Moreover, the fact that the record contains conflicting opinions from the Plaintiff's health care providers does not preclude a finding that the Committee did not abuse its discretion. "Confronted with this record of conflicting opinion, it was within the discretion of the [ ] Committee—indeed it was the duty of that body—to resolve the conflicts, and as [the Fourth Circuit has] previously recognized, 'it is not an abuse of discretion for a plan fiduciary to deny ... benefits where conflicting medical reports were presented.' " *Booth,* 201 F.3d at 345 (quoting *Elliott, supra* ); *Stup, supra.* It is particularly troubling to the undersigned that the Plaintiff's condition initially improved substantially but later declined with subjective reports of pain. And, those reports varied depending on the time frame and to whom the Plaintiff made the reports. While he described his shoulder pain as a constant 9 out of 10 to his physician, most of his complaints during group therapy related to emotional stress, especially family problems. In April 2001, he reported to his pain management nurse that he had been walking about five miles per day. Exhibit K, *supra,* at 00244. Yet, by August 2002, Dr. Scott, who had taken over his pain management, opined he was disabled from "any type of meaningful employment." *Id.,* at 00264. In addition to attacking the Plan's decision as against the substantive weight of the evidence, the Plaintiff argues that the Plan ignored the most recent medical evidence. The Court rejects the claim that the Committee failed to consider all of the evidence, focusing instead on dated medical records to the exclusion of the opinion of Dr. Eaton. "Simply because [the Plan] did not rely on Plaintiff's evidence does not mean that it ignored it."

*Jordan,* 63 F.Supp.2d at 1156. Moreover, the summaries recited herein show that the Committee considered all of the medical evidence regardless of its timeliness. And, although the Committee may have been obligated to consider the most recent opinions of treating physicians, it was not compelled to accept or give greater weight to those opinions. *Smith,* 369 F.3d at 418–20; *Marsteller v. Life Ins. Co. of America,* 24 F.Supp.2d 593, 596 (W.D.Va.1998) (citing *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.,* 32 F.3d 120, 125 (4th Cir.1994)).

Plaintiff also claims that the Committee failed to follow the definitions of the Plan. The physical therapist who performed the functional capacities evaluation was not, he argues, a physician and, therefore, the Committee relied on her findings to the exclusion of treating physicians. However, the portion of the Plan cited by the Plaintiff applies only to the initial determination of disability benefits during the initial 24–month period. Nor does the Court find the Committee relied exclusively on the opinion of the physical therapist from HealthSouth. As discussed thoroughly *infra,* the Committee reviewed all of the medical evidence.

Plaintiff also argues, *albeit* obliquely, that the Committee should have ordered an independent medical examination. There is, however, no requirement that a Plan do so, as the Plaintiff admits, and the Court does not find that a failure to do so in this case constituted an abuse of discretion. *Laser v. Provident Life & Acc. Ins. Co.,* 211 F.Supp.2d 645, 650 (D.Md.2002). Moreover, the Plaintiff was free to supplement the record with any

ty of a plan administrator and of a physician upon whose opinion a plan administrator relied is a factor which the Court may consider," the fact remains in this case that the

Plaintiff admitted to the HealthSouth evaluator that he was indeed working. *Reagan,* 39 F.Supp.2d at 1126. He has not refuted that admission.

further evidence he felt appropriate. *Elliott,* 190 F.3d at 608 ("Given the extensive medical record before the Appeal Committee, Sara Lee was under no obligation to secure additional vocational evidence.... [The Plaintiff], however, was free to supplement the record."). There was no shortage of medical records, from both treating and evaluating health care providers, and the record discloses that the 'Appeal Committee considered all of those records.

Plaintiff also claims the opinion of the vocational case manager that Plaintiff could perform the job of telephone account representative was given greater credence than other medical evidence. The Plaintiff's own admission, however, that he was actually performing sedentary work belies this argument. *Jordan,* 63 F.Supp.2d at 1156 ("Moreover, Plaintiff's own attestations to [his] conditions somewhat undercut [his] assertions of total disability."). The Plaintiff's remaining arguments are unsupported by the record. The decision specifically stated that the Committee had evaluated the Plaintiff's impairments in combination and the Plaintiff has submitted only speculation that this was not done, speculation borne only of the fact that he was found not disabled. Likewise, his claim that the Committee failed to consider his educational background is dispelled by the Committee's direct comment that it did not find he was "virtually illiterate" as characterized by his attorney. Indeed, the Plaintiff makes only conclusory claims in this regard which are insufficient to defeat summary judgment. *Reese v. Meritor Automotive, Inc.,* 5 Fed.Appx. 239 (4th Cir.2001). The other grounds raised by the Plaintiff do not warrant further attention.

The record submitted to the Court was voluminous and it has been reviewed in detail. The undersigned concludes that the decision was reasonable; that is, "it is the result of a deliberate, principled reasoning process and ... is supported by substantial evidence." *Stup, supra.* "Under the circumstances, [the Court] find[s] that an administrator, free of Sara Lee's apparent financial conflict of interest in serving as both fiduciary and insurer, would have been justified in denying [the Plaintiff] benefits. Sara Lee's decision was, therefore, a reasonable exercise of its discretion." *Elliott,* 190 F.3d at 608.

## IX. ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's motions to settle the record, to strike and for summary judgment are hereby **DENIED;** and

**IT IS FURTHER ORDERED** that the Defendant's motion for summary judgment is hereby **GRANTED.** A Judgment is filed herewith.

## *JUDGMENT*

For the reasons set forth in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED** that the Plaintiff's motion for summary judgment is **DENIED,** the Defendant's motion for summary judgment is **ALLOWED,** and this matter is hereby **DISMISSED** with prejudice in its entirety.